## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

BMT ENTERPRISES, INC.,

               Plaintiff,

v.

                  **MEMORANDUM OF LAW & ORDER**
                  Civil File No. 10-4371 (MJD/FLN)

HARTFORD CASUALTY
INSURANCE COMPANY,

               Defendant.

---

Francis J. Rondoni and Gary K. Luloff, Chestnut Cambronne, PA, Counsel for
Plaintiff.

Robert E. Salmon and Tiffany M. Brown, Meagher & Geer, PLLP, Counsel for
Defendant.

---

## I.     INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Summary

Judgment [Docket No. 24] and Defendant's Motion for Summary Judgment

[Docket No. 35]. The Court heard oral argument on May 11, 2012. The Court

denies both motions because genuine issues of material fact remain.

## II.    BACKGROUND

### A.    Factual Background

Plaintiff BMT Enterprises, Inc. ("BMT") is a Minnesota corporation, incorporated in 2004 and owned by Carolyn Hamilton, who was also its CEO. (Pl. Ex. B; Pl. Ex. C, C. Hamilton Dep. 48.)  BMT sold gift items, such as jewelry, to casino stores.  (Compl. ¶ 11.)

Hamilton met Roger Dencklau in August 2006.  (Pl. Ex. JJ, R. Dencklau Dep. 21.)  At that time, BMT retained Roger Dencklau and one of his companies, Integrity Home Buyers, to assist with bookkeeping for BMT, including writing checks, paying bills, handling deposits, and communicating with BMT's tax attorney and its insurance representative, Advance Insurance Agency, Inc. ("Advance").  (C. Hamilton Dep. 49, 52.)  BMT provided him with a key to its office in Burnsville, Minnesota.  (Id. 91, 93.)  In previous federal litigation, BMT identified Roger Dencklau as its Chief Financial Officer.  (Def. Ex. A, W.D. Mich. BMT Cross Claim ¶ 36 ("Roger and Barbara Dencklau had a fiduciary duty to the Hamilton Defendants, specifically as to Defendant Roger Dencklau given his role as Chief Financial Officer with Defendant BMT, and Barbara Dencklau as a salesperson with Defendant BMT.").)  Hamilton admitted that she knew Roger Dencklau "called himself that [CFO], and at that time I believed that since he called himself that I would call him that," and "[i]t was just less complicated that

way." (Hamilton Dep. 242-43.) Roger Dencklau has testified: "I was employed as the CFO [of BMT]. I don't think you can technically say I was employed. There were no documents filed or there was no I-9 filled out. There was no W-2 or even a W-4 for withholding." (R. Dencklau Dep. 32.) Roger Dencklau did not receive compensation for his involvement with BMT. (Id.; C. Hamilton Dep. 66.)

According to BMT, Barbara Dencklau had no official role with BMT. (C. Hamilton Dep. 54.) However, Hamilton "might have said [that Barbara Dencklau was a salesperson] if she was with [Hamilton] because [she] had to explain why she was with [her]." (Id. 55.) In connection with another lawsuit, Barbara Dencklau testified that she was never an owner or employee of BMT. (Pl. Ex. KK, B. Dencklau Dep. 9, 40-41, 57.)  But she helped by "[s]orting jewelry, going out on the road and attempting to sell jewelry and Native American artifacts." (Id. 9-10, 39-40.) She claimed that she did this work at Hamilton's direction. (Id.) Hamilton testified that Barbara Dencklau sometimes attempted to sell jewelry from BMT's warehouse by throwing jewelry parties or making sales calls, but she was not authorized to do so. (C. Hamilton Dep. 55-57.)

In a previous federal lawsuit, Hamilton admitted that she went on sales trips with Barbara Dencklau and that Barbara Dencklau helped her handle a

transaction with one of its primary customers.  (Def. Ex. Q, 2010 C. Hamilton

Dep. 40-42.)  In that same federal lawsuit, Hamilton alleged that "Roger

Dencklau brought Defendant Barbara Dencklau into the business [BMT],

purportedly as a buyer for Defendant BMT but she never worked as an employee

of the business."  (Def. Ex. A, W.D. Mich. BMT Cross Claim ¶ 7.)  Hamilton also

alleged that Barbara Dencklau was "a salesperson with Defendant BMT."  (Id. ¶

36.)  In that lawsuit, Barbara Dencklau represented that she was not a BMT

employee.  (See Pl. Ex. GG, W.D. Mich. Dencklau Answer at 10 ("With respect to

Barbara Dencklau, the Dencklau Defendants deny that she was an employee of

any of the entities, but admit that she underwent training to become a sales

representative of the company.").)

## 1.     BMT's Purchase of Hartford Insurance

Susan Paskoff is an employee of Advance.  (Def. Ex. C, Paskoff Dep. 18.)

She held herself out as an "independent agent," meaning that her "customer is

always the insured."  (Id. 84.)  Defendant Hartford Casualty Insurance Company

("Hartford") was one of the companies to which Paskoff was authorized to

submit insurance applications; Paskoff is aware that Advance has a contract with

Hartford, but she has never seen it.  (Id. 87.)

In the fall of 2006, Paskoff met with Roger Dencklau and then met Carolyn

Hamilton at BMT's original location in Savage, Minnesota.  (Paskoff Dep. 18-20.)

Roger Dencklau told Paskoff that he was the owner of BMT and introduced

Carolyn Hamilton as his business partner.  (Id. 18, 20.)  After the meeting,

Advance uploaded information onto Hartford's system and put together an

insurance quote.  (Id. 29-30.)  Paskoff presented the quote to Roger Dencklau,

who accepted it.  (Id. 49-52.)  Advance issued an insurance binder and, then

Hartford issued a business liability coverage insurance policy, Policy No. 41 SBA

UP2100 SA ("Policy"), to BMT.  (Id.; Pl. Ex. A, Policy.)

## 2.  Terms of the Hartford Policy

The Policy was in effect from November 3, 2006 through October 1, 2007.

(Policy at HP0167.)  It included a $300,000 coverage limit for business personal

property.  (Id. at HP0005.)

Among other things, the Policy provides coverage "for direct physical loss

of or physical damage to Covered Property at the premises described in the

Declarations (also called 'scheduled premises' in this policy) caused by or

resulting from a Covered Cause of Loss."  (Policy at HP0017.)  The Policy further

defines "Covered Property" as buildings and as "Business Personal Property

located in or on the building(s) described in the Declarations at the 'scheduled

premises' or in the open (or in a vehicle) within 1,000 feet of the 'scheduled

premises.'"  (Id.)  "'Scheduled Premises' means any premises listed by location

address in the Scheduled Premises section of the Declarations."  (Id. at HP0041.)

The Policy Declarations list the following scheduled premises: "7450 Eagan

Drive, Savage MN 55378."  (Id. at HP0005.)

The Policy contains an exclusion for physical loss resulting from the

dishonest acts by BMT's employees or authorized representatives.  (Policy at

HP0033.)

The Policy also addresses the ability to change the Policy terms:

**COMMON POLICY CONDITIONS**

All coverages of this policy are subject to the following conditions.

* * *

**B.  Changes**

This policy contains all the agreements between you and us
concerning the insurance afforded.  The first Named Insured shown
in the Declarations [BMT] is authorized to make changes in the
terms of this policy with our consent.  This policy's terms can be
amended or waived only by endorsement issued by us and made a
part of this policy.

(Policy at HP0012.)

### 3.   The 2007 Promissory Notes

In early 2007, BMT, through Carolyn Hamilton, signed 18 secured

promissory notes and corresponding security agreements totaling more than

$300,000.  (Hamilton Dep. 120-22, 128-31; Pl. Exs. N-Q.)  The notes were payable

to either Roger Dencklau or his companies, Integrity Home Buyers, LLC, and

R.K. Dencklau Limited.  All notes and security agreements were dated March 2,

2007.  They were the subject of UCC Financing Statements that were filed with

the Minnesota Secretary of State.  (Pl. Exs. R-T.)  The security agreements granted

Roger Dencklau or his companies a security interest in BMT's inventory,

equipment, accounts, and proceeds.

Carolyn Hamilton admits signing the 18 secured promissory notes and

security agreements, but contends that they were invalid due to a separate

document, signed by Carolyn Hamilton and Roger Dencklau on February 27,

2007, and dated February 27, 2007, stating:

> Three notes were signed by Carolyn Hamilton on February 27, 2007.
> These notes do not constitute any valid or meaningful agreement
> between the parties and have been written solely as a method of
> protection of the assets of Carolyn and James Hamilton and BMT
> Enterprises, Inc.

 (Pl. Ex. U.)  She testified that Roger Dencklau told her that the notes did not

represent actual debt and that he needed the notes in order to obtain financing.

7

(C. Hamilton Dep. 117, 123.)  Carolyn Hamilton claims that she received no

money as a result of executing the documents.  (Id. 118-20, 123.)

### 4.    BMT's Change of Address

On June 15, 2007, BMT notified Advance that BMT was moving its

business that day to 2999 County Road 42 West, #110, Burnsville, Minnesota.  (Pl.

Ex. H.)  Paskoff's summary of the telephone call between Roger Dencklau and

Advance states "Please change locations with Htfd. package/wx." (Id.)

On June 22, 2007, BMT's address change request was communicated by

Paskoff's customer service representative, Terry Roehl, to Hartford in a Policy

Memo.  (Pl. Ex. I-J.)  The Policy Memo states "Change address, Premises location

and Mailing."  (Id.)

On July 3, 2007, a Hartford sent a letter to Advance, attention Terry Roehl,

regarding the BMT Policy.  The letter stated that "information needed to process

this change was omitted from your request."  (Pl. Ex. FF.)  Specifically, Hartford

advised Advance that it needed "building information" for the new premises,

including information such as "The year the building was built;" "The distance

to the responding fire department;" "The distance to the nearest fire hydrant;"

"When the electrical system was last updated;" and "When the roof was last

replaced." (Id.)  Paskoff testified that the type of building structure information requested by Hartford was just as important for an underwriter to evaluate as was the case with the original issuance of the policy.  (Def. Ex. C, Paskoff Dep. 109-11.)

Advance has no record of receiving Hartford's July 3, 2007 request.  (Def. Ex. E, Roehl Dep. 67-69.)  Advance has no recollection of providing any of the requested information to Hartford.  (Id. 89.)

On July 19, 2007, Roehl submitted a new change request to Hartford regarding BMT's mailing address to add the suite number to the Burnsville address, to be effective July 10, 2007.  (Def. Ex. F.)  This request sought to add the suite number to the address because the post office was not delivering the mail without the suite number.  (Id.)

Hartford issued Endorsement 3 to the Policy, effective July 10, 2007, which amended the mailing address but did not amend the scheduled premises to the Burnsville location.  Endorsement 3 provided:

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**POLICY CHANGE**

This endorsement changes the policy effective on the Inception Date of the policy unless another date is indicated below:

* * *

POLICY CHANGE NUMBER:  003

* * *

POLICY CHANGES:

* * *

MAILING ADDRESS IS CHANGED TO READ: 2999 COUNTY
ROAD 42 W STE 110
BURNSVILLE, DAKOTA
MN. 55306

* * *

THIS ENDORSEMENT DOES NOT CHANGE THE POLICY EXCEPT AS SHOWN.

* * *

Process Date:        07/21/07       Policy Effective Date:      07/10/07

(Policy at HP0164.)


### 5.    September 29, 2007 Incident

On September 29, 2007, Carolyn Hamilton arrived at the BMT office in

Burnsville and saw a moving truck in the parking lot and Barbara Dencklau

coming out of the offices carrying something.  (C. Hamilton Dep. 170-72.)

10

Barbara Dencklau got into her car and left, and the moving truck left with her.

(Id. 172.)  Barbara Dencklau had used keys, entered the BMT premises, and

removed a significant portion of BMT's inventory, computers, and records.  (Pl.

Ex. L, J. Hamilton Dep. 71-72; Pl. Ex. M, Drummer Dep. 24.)

BMT reported the incident to the Burnsville police.  In the Burnsville police

report, Carolyn Hamilton reported that Roger Dencklau was "her partner" and

that they owned the jewelry business together.  (Pl. Ex. BB at HC00863.)  She

further stated that Barbara Dencklau worked at BMT and that the two were

supposed to go on a business trip to sell items that day.  (Id.)  The police

investigated and concluded that it was a "civil issue."  (Id.)

BMT admits receiving, from the Dencklaus' attorney, an October 19, 2007

Notice of Disposition of Collateral referencing the UCC filing numbers

corresponding to the notes, which BMT referred to its own attorney.  (Def. Ex. K;

C. Hamilton Dep. 243-46.)  The Notice states that BMT's jewelry inventory would

be subject to a private sale.  (Def. Ex. K; C. Hamilton Dep. 244.)

### 6.    The Hennepin County Lawsuit

In December 2007, Roger and Barbara Dencklau, Integrity Home Buyers,

LLC, and R.K. Dencklau Limited sued Carolyn and James Hamilton, BMT, and

11

others in Hennepin County Court, alleging breach of contract, fraud, and

misappropriation.  In that case, the plaintiffs alleged:

> Roger loaned substantial sums of money to the company [BMT].
> Some of those loans were secured by UCC Statements, true and
> correct copies of which are attached hereto as Exhibits 1-3.
>
> The funds advanced to BMT were to provide inventory and to
> otherwise pay its operating expenses.
>
> * * *
>
> Plaintiffs have exercised their rights as secured parties and secured
> certain inventory and equipment owned by the company.

(Def. Ex. H, Hennepin County Compl. ¶¶ 14-15, 22.)  In the complaint, the

Dencklau plaintiffs sought to recover on the notes and sought to foreclose on

their security interests in the collateral.  (See id. ¶¶ 25-32.)

Also in this lawsuit, BMT alleged that both Dencklaus were involved in the

alleged theft:

> Barbara Dencklau, with the permission and assistance of Roger
> Dencklau, entered the BMT warehouse and stole over $350,000 of
> merchandise in September 2007.
>
> * * *
>
> Plaintiffs Barb and Roger Dencklau have wrongfully possessed
> $350,000 worth of BMT's inventory that they removed from BMT's
> warehouse in September, 2007.

(Def. Ex. M, BMT Hennepin County Counterclaim ¶¶ 18, 29.)

The case settled before there was any judicial determination of whether the Dencklaus had the right to repossess BMT's inventory or whether it had been stolen.  (Def. Ex. I.)  Under the settlement agreement, Barbara Dencklau agreed to return the items to BMT that she had taken and still had in her possession.  (Id.; C. Hamilton Dep. 246.)  However, according to BMT, Barbara Dencklau only returned a portion of the property that had been taken.  (C. Hamilton Dep. 7-8; Pl. Ex. K, LaCourse Dep. 13.)  BMT claims that the amount of property taken exceeded $300,000.  (Pl. Ex. V; Pl. Ex. Z.)

7.   **The Western District of Michigan Lawsuit**

In 2009, The Sault St. Marie Tribe of Chippewa Indians filed a lawsuit alleging fraud against the Hamiltons, the Dencklaus, BMT, and others in the United States District Court for the Western District of Michigan.  (Pl. Ex. GG.) Roger and Barbara Dencklau asserted cross claims against the Hamiltons and BMT asserting:

> Roger Dencklau agreed to help the Hamiltons by purchasing a different house for them.  In addition, he injected several hundred thousand dollars into the business in order to satisfy various obligations and obtain inventory.  Because selling to tribal casinos was done primarily in person, Barbara Dencklau was to become a sales representative to help cover the substantial territory involved.

13

After several months, the Dencklaus became concerned because, among other things, Carolyn Hamilton would sometimes sell inventory for cash and keep the money for herself, Carolyn Hamilton would use the Dencklaus' credit cards for unauthorized purchases, and, in general, money was not flowing into the business the way it had been promised.

As a result of these concerns, Barbara Dencklau took possession of certain business assets pursuant to a security agreement that had been executed.  That action triggered the events which uncovered the scam that was being perpetrated by Carolyn Hamilton and Plaintiff's agent, Tina Gardner.

(Pl. Ex. GG, Dencklau W.D. Mich. Cross Claim ¶¶ 10-12.)

In the Hamiltons' and BMT's cross claim against the Dencklaus, Carolyn

Hamilton swore, individually and on behalf of BMT, that both of the Dencklaus

were involved in the alleged theft:

Immediately before the Dencklau's [sic] involvement with the Hamilton Business Defendants there was $225,000.00 of inventory on hand for the furtherance of the business.  Shortly after their involvement, there was another $200,000.00 in inventory acquired for the business.  This inventory was substantially, if not completely, converted by the Dencklau's [sic] to their use and was claimed by Barbara Dencklau as an asset of the marital estate in her divorce action from Roger Dencklau.

* * *

Examples of the unjust enrichment [by Roger and Barbara Dencklau] include, but are not limited to, directing payment of funds into their own names and the names of their children, concealing and not

account[ing] for sales and income realized through the Hamilton
Defendants' businesses, converting business inventory to their own
use, and creating a false scheme of fraud to conceal their taking of
Hamilton Defendants' assets.

(Def. Ex. A, BMT W.D. Mich. Cross Claim ¶¶ 11, 39.)

BMT and Carolyn Hamilton settled with the Sault Ste. Marie Tribe of

Chippewa Indians before there was any judicial determination of whether the

Dencklaus had the right to repossess BMT's inventory or whether it had been

stolen.  (Def. Ex. J.)

### 8.   BMT's Submission of Insurance Claims

In June 2009, BMT first submitted a property claim to Hartford for the

property taken on September 29, 2007.  (Pl. Exs. W, EE.)  On July 2, 2009,

Hartford acknowledged receipt of the claim in a reservation of rights letter.  (Pl.

Ex. X.)

On October 8, 2009, Hartford denied coverage on the grounds that the

Dencklau incident did not take place on the scheduled premises in Savage,

Minnesota.  (Pl. Ex. AA.)  Hartford also reserved its rights under the Policy

concerning other policy terms, including the Employee Dishonesty endorsement.

(Id.)

### B.   Procedural History

15

BMT claims that it suffered a theft loss on September 29, 2007.  It claims that the lost property falls within the category of "Business Personal Property" under the Policy.  Therefore, it concludes that Hartford breached the Policy by not providing coverage.

On October 26, 2010, BMT filed a Complaint against Hartford in this Court alleging: Count One: Breach of Contract.  The parties now move for summary judgment against each other.

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of

<u>Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).

**B.     Interpretation of an Insurance Contract**

"Interpretation of an insurance policy, and its application to the facts of the

case, are questions of law." <u>Franklin v. W. Nat'l Mut. Ins. Co.</u>, 574 N.W.2d 405,

406 (Minn. 1998) (citation omitted).  "General contract principles govern the

construction of insurance policies, and insurance policies are interpreted to give

effect to the intent of the parties." <u>Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co.</u>, 615

N.W.2d 341, 344 (Minn. 2000) (citation omitted).  "Because most insurance

policies are preprinted forms drafted solely by insurance companies—basically

contracts of adhesion—policy words of inclusion will be broadly construed, and

words of exclusion are narrowly considered." <u>Gen. Cas. Co. of Wis. v. Wazniak</u>

<u>Travel, Inc.</u>, 762 N.W.2d 572, 575 (Minn. 2009) (citations omitted).  Unambiguous

words are given their "plain, ordinary, and popular meaning." <u>Id.</u> (citation

omitted).  If terms are ambiguous and reasonably susceptible to more than one

interpretation, they will be construed against the insurer and interpreted

liberally in favor of finding coverage. <u>Id.</u>

"While the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions. Insurance contract exclusions are construed narrowly and strictly against the insurer, and, like coverage, in accordance with the expectations of the insured." Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 894 (Minn. 2006) (citations omitted).

### C.     Scheduled Premises

#### 1.     Whether the Alleged "Loss" Took Place on the "Scheduled Premises"

It is uncontradicted that the alleged loss did not take place at the Policy's "scheduled premises" in Savage, Minnesota, as required by the Business Personal Property section of the Policy.  The Policy identifies the "scheduled premises" as "7450 Eagan Drive, Savage, Minnesota."  The theft loss for which BMT seeks coverage occurred at 2999 County Road 42, Burnsville, Minnesota. (Compl. ¶ 14.)

Nor is there any evidence that Hartford, itself, consented to a change in the scheduled premises.  In response to the request to change the scheduled premises address, Hartford requested the same type of underwriting information concerning the new location that it would have requested for the original policy.

Neither BMT nor Advance provided the required information to Hartford. Endorsement 3, which, changed the Policy's mailing address only, stated in capital letters: "THIS ENDORSEMENT DOES NOT CHANGE THE POLICY EXCEPT AS SHOWN."  (Policy at HP0164.)

Therefore, BMT cannot establish a prima facie case of coverage based on the Policy language, unless it can show that Advance bound Hartford to an amendment to the Policy, changing the scheduled premises location.

### 2.    Advance's Agency Status

The parties dispute whether Advance agreed to change the scheduled premises and, if so, if it bound Hartford to an amended Policy.

### a)    Whether Advance Was an Insurance Agent or an Insurance Broker

Hartford argues that Advance was an insurance broker, not Hartford's agent; therefore, Hartford cannot be held liable for any acts or omissions by Advance.  See, e.g., Employers' Mut. Cas. Co. v. Wendland & Utz, Ltd., 351 F.3d 890, 896 (8th Cir. 2003) ("[A]n insurance company is only liable for the torts of its agents.  Conversely, a broker is 'independently liable to the insured in either contract or tort for failing to procure insurance as instructed.'  In other words, a

broker's liability for negligence cannot be imputed to the insurance company.")

(applying Minnesota law) (quoting <u>Frank v. Winter</u>, 528 N.W.2d 910, 914 (Minn.

Ct. App. 1995)).

This distinction between agent and broker "appears to have been

superseded by statute." <u>Graff v. Robert M. Swendra Agency, Inc.</u>, 800 N.W.2d

112, 118 n.5 (Minn. 2011).  Minnesota Statute § 60K.49, subdivision 1, provides

that "[a] person performing acts requiring a producer license under this chapter

is at all times the agent of the insurer and not the insured."  A producer license is

required to "sell, solicit, or negotiate insurance."  Minn. Stat. § 60K.32.  Section

65A.14 provides: "Every person who solicits insurance and procures an

application therefor shall be held to be the agent of the party afterward issuing

insurance thereon or a renewal thereof."  Here, there is evidence that Advance

solicited or sold Hartford's insurance to BMT and procured BMT's application

for Hartford.  Therefore, Advance could be considered Hartford's agent.

However, this conclusion does not end the analysis because the Court must still

examine the <u>scope</u> of Advance's agency.

Neither of the statutes cited by BMT confers authority upon an agent to

bind an insurer without limitation.  In fact, Minnesota Statute § 60K.32 provides

20

that "[t]he license [to sell a class or classes of insurance] does not create any

authority, actual, apparent, or inherent, in the holder to represent or commit an

insurance carrier." See also Dose v. Ins. Co. of State of Penn., 287 N.W. 866, 868

(Minn. 1939) (holding that a Minnesota fire insurance statute which provided

that "[e]very person who solicits insurance and procures an application therefor

shall be held to be the agent of the party afterwards issuing insurance thereon or

a renewal thereof" "does not define the scope of the agency it creates").

### b) Scope of Advance's Agency

"An agent's representations bind the insurer if the agent has actual,

implied, or apparent authority to make such representations." Graff, 800 N.W.2d

at 117 (citation omitted).

### (1) Actual or Implied Authority

Advance had a contractually defined agency relationship with Hartford,

which explicitly authorized Advance to solicit and bind coverage on behalf of

Hartford.  However, the agency agreement also bars Advance from changing or

waiving any provisions of an already-issued policy.  Therefore, the current

record cannot support a finding that Advance had actual authority to bind

Hartford to a change in the scheduled premises in the already-issued Policy.

Nor does the record establish that Advance had implied authority to amend the Policy.  "Implied authority is actual authority which includes such powers as are directly connected with and essential to the business specifically entrusted to an agent." Hornblower & Weeks-Hemphill Noyes v. Lazere, 222 N.W.2d 799, 805 (1974).  Here, the scope of Advance's actual authority is set forth in its agreement with Hartford, and that agreement explicitly states that Advance does not have the authority to change the terms of a policy.

### (2)      Apparent Authority

There is a genuine issue of material fact regarding whether Advance had apparent authority to amend the already-issued Policy.  Apparent authority is "authority which a principal holds an agent out as possessing, or knowingly permits an agent to assume." Foley v. Allard, 427 N.W.2d 647, 652 (Minn. 1988).  "The scope of an insurance representative's apparent authority to act on behalf of his company is an issue of fact to be determined by the evidence." Automated Sys., Inc. v. Nat'l Indem. Co., 269 N.W.2d 749, 752 (Minn. 1978).  See also Hagedorn v. Aid Ass'n for Lutherans, 211 N.W.2d 154, 157 (Minn. 1973) ("Whether an agent was clothed with apparent authority to act as he did is a question for the trier of fact.").

> An agent's apparent authority results from statements, conduct, lack
> of ordinary care, or other manifestations of the principal's consent,
> whereby third persons are justified in believing that the agent is
> acting within his authority.  Therefore, the scope of apparent
> authority is determined not only by what the principal knows and
> acquiesces in, but also by what the principal should, in the exercise
> of ordinary care and prudence, know his agent is doing.

McGee v. Breezy Point Estates, 166 N.W.2d 81, 89 (Minn. 1969).  The Minnesota Supreme Court has long held that, when an insurance company holds out insurance agents as its full agents in order to induce customers into purchasing its policies, it is bound by those agents' actions in connection with those transactions:

> The [insurance] companies employ [insurance agents] for that
> purpose [to solicit insurance], and the public regard them as the
> agents of the companies in the matter of preparing and filling up
> these applications, -- a fact which the companies perfectly
> understand.  The parties who are induced by these agents to make
> applications for insurance rarely know anything about the general
> officers of the company, or its constitution and by-laws, but look to
> the agent as its full and complete representative in all that is said or
> done in regard to the application.  And in view of the apparent
> authority with which the companies clothe these solicitors, they
> have a perfect right to consider them such.

Kansel v. Minn. Farmers' Mut. Fire Ins. Ass'n, 16 N.W. 430, 430 (Minn. 1883).

Here, BMT conducted all business with Hartford through Advance, both before and after purchasing the Policy.  Advance exercised its explicit authority,

granted by Hartford, to bind Hartford to the initial insurance contract with BMT. There is no evidence that Hartford informed BMT of any limits on Advance's authority to bind Hartford.  BMT requested a change of address for its insurance coverage from Advance.  See Kansel, 16 N.W. at 432 (holding that when insured made honest representations as to the facts requested in the insurance application and the insurer's agent failed to properly fill out the application, "if the policy does not cover the loss it is the fault of the defendant [insurer] and not of the plaintiff").  The evidence currently before the Court does not definitively establish what Hartford knew and acquiesced to, beyond the language in the written contract between Hartford and Advance.  Nor does the current record establish what Hartford should, in the exercise of ordinary care and prudence, have known that Advance was doing as far as making changes to existing policies which were initially negotiated and bound by Advance.  See McGee, 166 N.W.2d at 87-90 (holding that plaintiffs' agent had apparent authority to modify the contract between plaintiffs and defendants because plaintiffs conducted all business with defendants through their agent, agent negotiated the original terms of the contract between plaintiffs and defendants, and plaintiffs never informed defendants of any limits on his agency authority).  The Court concludes

that there are genuine questions of material fact regarding Advance's authority

as an agent, what representations Advance made to BMT, and whether Hartford

was bound by representations made by Advance.  Summary judgment on this

issue is denied.

### 3.    Doctrine of Illusory Coverage

BMT alternatively argues that it is entitled to summary judgment because,

under Hartford's theory, BMT was left with eviscerated coverage because BMT

no longer had an insurable interest in the "scheduled premises" listed, so

Hartford continued to accept premium payments without incurring any risk.  See

Jostens, Inc. v. Northfield Ins. Co., 527 N.W.2d 116, 118 (Minn. Ct. App. 1995)

("Under the doctrine of illusory coverage, [l]iability insurance should, if possible,

be construed so as not to be a delusion to the insured.") (citation omitted).

The illusory coverage doctrine does not apply here.  BMT can identify no

particular portion of the Policy premium that went only to Business Personal

Property coverage.  The Policy continued to provide various other types of

coverage that were not dependent on the scheduled premises term, so Hartford

did not collect premiums with no risk of loss.  (See, e.g., Policy, Umbrella

Liability Provisions at HP140-53.)  Therefore the Policy's coverage was neither

illusory nor eviscerated.  See Jostens, Inc., 527 N.W.2d at 118-19 (holding illusory

coverage doctrine applicable only when "part of the premium is specifically

allocated to a particular type or period of coverage and that coverage turns out to

be functionally nonexistent," and so, is inapplicable based on failure to cover

discrimination damages when "the policy was much more than a simple

'discrimination damages' policy[;] [r]ather, it afforded excess and umbrella

coverage for a wide variety of damages other than those arising from

discrimination").  See also BancInsure, Inc. v. Marshall Bank, N.A., 453 F.3d 1073,

1076 (8th Cir. 2006) (denying application of the illusory coverage doctrine where

"[s]everal factual scenarios . . . would have clearly resulted in coverage under the

policy").

### 4.     Doctrine of Reasonable Expectation

BMT argues that it is entitled to coverage because it reasonably expected

that its new business location would be covered by the Policy, under the

reasonable expectations doctrine.  See Atwater Creamery Co. v. W. Nat'l Mut.

Ins. Co., 366 N.W.2d 271, 278-79 (Minn. 1985).  The reasonable expectations

doctrine does not apply in BMT's favor here.   The Minnesota Supreme Court has

clarified that this doctrine only applies to "resolv[e] ambiguity," and BMT can

point to no ambiguity here.  <u>Carlson v. Allstate Ins. Co.</u>, 749 N.W.2d 41, 49

(Minn. 2008).  Furthermore, <u>Atwater</u> is limited "at least to circumstances where

the exclusion from coverage was unreasonably hidden."  <u>Id.</u>  Here, there is no

exclusion at issue, and there is no allegation of the scheduled premises term

being hidden.

### D.    Loss

Because there is a genuine issue of material fact regarding whether

Advance bound Hartford to the changed address for the scheduled premises, the

Court need not reach BMT's argument that it has established a covered "loss,"

and Hartford does not request summary judgment on this issue, acknowledging

that there is a genuine question of material fact regarding whether BMT's

inventory was stolen or repossessed pursuant to a valid security interest.  In any

case, a question of fact remains regarding whether the security agreements are

valid and whether BMT actually suffered a financial detriment.

### E.    Double Recovery

There is also a genuine issue of material fact regarding whether BMT

would obtain double recovery if it obtained coverage here.  Hartford asserts that

the Hennepin County lawsuit, initiated by the Dencklaus, demonstrates that the

alleged theft was a civil dispute.  The validity of the security interest was never resolved in the state court action because BMT chose, instead, to settle the case and release its claims against the alleged thieves.  In exchange for its release of its claims against the Dencklaus, BMT received a release of the Dencklaus' claims against BMT, including a claim for the alleged outstanding debt, which Hartford argues is more than $300,000, and the returned inventory.  Hartford asserts that BMT received consideration and, in exchange, fully and finally released all claims, thereby barring any future claim that it had sustained a "loss."

BMT argues that, although it settled with the Dencklaus, the Dencklaus failed to honor the terms of the settlement agreement and BMT now seeks to recover from Hartford the value of the property stolen and not returned pursuant to the settlement agreement.

The value of the settlement agreement from the Hennepin County lawsuit is unclear and it is not clear to what extent the settlement agreement was honored.  The Court cannot enter summary judgment on the issue of double recovery.

**F.     Dishonesty Exclusion**

The Court denies summary judgment on the issue of the applicability of the dishonesty exclusion.  There are genuine issues of material fact with regard to the roles of Roger Dencklau, Barbara Dencklau, and Carolyn Hamilton.

### 1.    Policy Language

The Policy contains the following exclusion:

> 2.    We will not pay for physical loss or physical damage caused by or resulting from:
>
> * * *
>
> e.    Dishonesty: Dishonest or criminal act by you, any of your partners, "members", officers, "managers", employees, directors, trustees, authorized representatives or anyone to whom who entrust the property for any purpose:
>
> (1)    Acting alone or in collusion with others; or
>
> (2)    Whether or not occurring during the hours of employment.
>
> This exclusion does not apply to acts of destruction by your employees; but theft by employees is not covered.

(Policy at HP0033.)

Hartford argues that, to the extent a theft occurred, the Dishonesty Exclusion applies because 1) Roger Dencklau was an authorized representative

or a person to whom BMT entrusted its property, and he was involved in the

theft; 2) Barbara Dencklau was an employee and was involved in the theft; or 3)

Carolyn Hamilton was an employee and was involved in the loss.

### 2. Roger Dencklau

#### a) Whether Roger Dencklau Was an Employee or Authorized Representative

There is a genuine issue of material fact regarding whether Roger

Dencklau was an employee, authorized representative, or person to whom BMT

entrusted its property, and he was involved in the "theft."

BMT admittedly gave Roger Dencklau authority to perform its

bookkeeping, accounting, and other financial tasks, including writing checks,

paying bills, handling deposits, and communicating with BMT's tax attorney and

insurance representatives. BMT also provided him with a key to the warehouse

where the alleged theft occurred. In the Burnsville police report, Carolyn

Hamilton reported that Roger Dencklau was "her partner" and that they owned

the jewelry business together. She further admits calling him the CFO. On the

other hand, Roger Dencklau testified that he was not "technically" employed by

BMT, and he was not compensated by BMT. This evidence is sufficient to raise a

genuine question of material fact regarding whether Roger Dencklau was an

employee, authorized representative, or a person to whom BMT entrusted its property.

### b)    Whether Roger Dencklau Was Involved in the Alleged Theft

Furthermore, there are fact questions regarding whether Roger Dencklau was involved in the alleged theft.  In the Hennepin County lawsuit, Roger Dencklau alleged that he was involved in what BMT now characterizes as a theft. (See Def. Ex. H, Hennepin County Compl. ¶ 22 ("Plaintiffs [Roger and Barbara Dencklau, Integrity Home Buyers, LLC, and R.K. Dencklau Limited] have exercised their rights as secured parties and secured certain inventory and equipment owned by the company.").)  BMT's cross claim against the Dencklaus in the Michigan action alleged that Roger Dencklau was directly involved in the alleged theft – that the Dencklaus "convert[ed] business inventory to their own use."  (Def. Ex. A, W.D. Mich. BMT Cross Claim ¶¶ 11, 39.)

On the other hand, the witnesses to the alleged theft only saw Barbara Dencklau, not Roger Dencklau.  (See also C. Hamilton Dep. 135 ("Q. What was Roger Dencklau's involvement, if any, in the Dencklau incident as you understand it to be?  A. Roger Dencklau told me that he and his wife were

31

getting a divorce.  He wasn't involved in the theft.  He didn't know where the inventory was and his wife was crazy.").)

Even if Roger Dencklau was not been personally involved in carrying out the alleged theft, the evidence could support a theory that the alleged loss for which BMT seeks coverage still resulted from his dishonest or criminal acts due to the circumstances surrounding BMT's execution of the promissory notes. "Resulted from" means "causally connected with."  See Meadowbrook, Inc. v. Tower Ins. Co., 559 N.W.2d 411, 419 (Minn. 1997) (holding "arising out of" means "causally connected with"); SECURA Supreme Ins. Co. v. M.S.M., 755 N.W.2d 320, 326-27 (Minn. Ct. App. 2008) (holding that there is no substantive difference between the phrases "arising out of" and "results from," and, thus, "results from" means "causally connected to").  If the notes were invalid and represented some sort of fraudulent scheme by Roger Dencklau, as BMT now alleges, then the alleged loss could still have "resulted from" his dishonest acts.

### 3. Whether Barbara Dencklau Was an Employee or a Person to Whom BMT Entrusted the Property

Barbara Dencklau indisputably caused BMT's loss, if any loss occurred. The parties disagree, however, on whether she was an employee or a person "to whom [BMT] entrust[ed] the property for any purpose."

In the Michigan action, BMT swore that Barbara Dencklau was a salesperson with BMT.  Also, in reporting the alleged theft to the Burnsville police, Carolyn Hamilton reported that Barbara Dencklau worked at BMT and that the two were supposed to go on a business trip to sell items that day. Hamilton testified that she might have represented to others that Barbara Dencklau was a salesperson.  This evidence supports a conclusion that Barbara Dencklau was an employee or someone to whom BMT entrusted its property as one of its salespersons, such that, if there was a "loss," it resulted from the dishonest acts of Barbara Dencklau, and the exclusion applies.

On the other hand, Carolyn Hamilton testified that Barbara Dencklau had no official role at BMT.  Barbara Dencklau has asserted that she was not a BMT employee.  There is a genuine issue of material fact regarding whether the dishonesty exclusion applies based on the involvement of Barbara Dencklau.

### 4.    Carolyn Hamilton

Finally, there is a genuine issue of material fact regarding whether Carolyn Hamilton's own dishonesty caused the loss.  According to Carolyn Hamilton, the notes, upon which Barbara Dencklau's alleged repossession was based, were executed for one of two improper reasons: so that Roger Dencklau could

overinflate his net worth to his potential lenders in order to obtain financing (C. Hamilton Dep. 117-20, 123) or to give BMT's potential creditors the false impression that its assets were already encumbered and exempt them from collection efforts, i.e., that, as the "disclaimer" states, BMT, through Carolyn Hamilton, executed the notes "solely as a method of protection of the assets of Carolyn and James Hamilton and BMT" (Pl. Ex. U). If the notes are actually invalid, it may be because of Hamilton's own dishonest or criminal act of either signing the notes to misrepresent to Roger Dencklau's potential lenders that BMT owed him more than $300,000 or to misrepresent to BMT's own creditors that its assets were already encumbered by Roger Dencklau's security interest and, therefore, protected. The record could support a conclusion that the alleged repossession arose out of those false notes. However, the purpose and validity of the notes and Carolyn Hamilton's role in their creation remain open questions. Thus, there is a genuine issue of material fact regarding whether the dishonesty exclusion applies based on the acts of Carolyn Hamilton.

## IV.    CONCLUSION

The Court denies both motions for summary judgment. There are material fact questions regarding Advance's role and actions with regard to BMT's

attempt to change the scheduled premises; the settlement of the state court

lawsuit; the meaning of the promissory notes; the roles of the Dencklaus at BMT;

and the roles of the Dencklaus and Carolyn Hamilton in the alleged theft.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.   Plaintiff's Motion for Summary Judgment [Docket No. 24] is
     **DENIED**.

2.   Defendant's Motion for Summary Judgment [Docket No. 35]
     is **DENIED**.

Dated:  July 13, 2012                    s/ Michael J. Davis
                                         Michael J. Davis
                                         Chief Judge
                                         United States District Court